IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ESAEL MORALES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 21 CV 120 |
| ) | |
| The CITY OF CHICAGO, Illinois, a municipal ) | Judge VALDERRAMA |
| Corporation, Chicago Police Officers Joseph ) | |
| CABRERA, Christopher JANIA #17519, Hector,) | Magistrate Judge JANTZ |
| MATIAS #20897, Roxanna HOPPS #21218, ) | |
| Frank SZWEDO #21000, James BRAUN ) | |
| #20810 Brian TEDESCHI #20243, Fernando ) | |
| GOMEZ #4653, Bradley GROSSKOPF #18363,) | |
| Christian NUNEZ #5847 and Nicholas ) | |
| PIRAINO #6110 and Chicago Police Sergeants ) | |
| Frank RAMAGLIA #1775 and Thomas ) | |
| GORMAN #2515, ) | |
| ) | |
| Defendants. ) | |

## SECOND AMENDED COMPLAINT

ESAEL MORALES, by and through his attorneys, makes the following second amended complaint against Defendants CITY OF CHICAGO, Illinois, Chicago Police Officers Joseph CABRERA, Christopher JANIA, Hector MATIAS, Roxanna HOPPS, Frank SZWEDO, James BRAUN, Brian TEDESCHI, Fernando GOMEZ, Bradley GROSSKOPF, Christian NUNEZ, and Nicholas PIRAINO and Chicago Police Sergeants Frank RAMAGLIA and Thomas GORMAN (collectively, "Defendant OFFICERS"):

## JURISDICTION and VENUE

1. This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution as well rights protected by Illinois common law.

2. This Court has jurisdiction over the action pursuant to 28 U.S.C. §§1331, 1343 and 1367.

3. Venue is proper under 28 U.S.C. §1391(b). The events giving rise to the claims asserted in this

complaint occurred within this district.

## PARTIES

4. ESAEL MORALES ("MORALES") is a 23-year-old resident of Chicago, Illinois.

5. At all relevant times, all Defendant OFFICERS, Jania, Ramaglia, Grosskopf, Piraino, Gomez and Nunez are or were Chicago police officers or sergeants, employed by Defendant CITY, acting under color of law and within the scope of their employment.

6. At all relevant times, Defendant CABRERA was an off-duty Chicago police officer, but acting under color of law and within the scope of his employment.

7. At all relevant times, Defendant GORMAN was a Chicago Police Sergeant, employed by Defendant CITY, acting under color of law and within the scope of his employment.

8. At all relevant times, all Defendant DETECTIVES, Szwedo, Hopps, Matias, Braun and Tedeschi are or were Chicago police detectives, employed by Defendant CITY, acting under color of law and within the scope of their employment.

9. Defendant CITY is a municipal corporation duly incorporated under the laws of the State of Illinois, and was at all relevant times the employer and principal of Defendant OFFICERS. Should Plaintiff prevail on his claims, Defendant CITY is liable to Plaintiff as the principal on his state law claims pursuant to the doctrine of *respondeat superior*, and must indemnify Defendant OFFICERS, CABRERA, GORMAN, and DETECTIVES on his federal claims pursuant to 745 ILCS 10/9-102.

### The Events of October 13, 2020

10. On the evening of October 13, 2020, MORALES and his girlfriend went on a date: they went to Wingstop, purchased food, and then sat in the car together having dinner and watching Netflix.

11. Neither MORALES nor his girlfriend had consumed any alcohol or drugs on October 13, 2020.

12. At approximately 9:45 p.m. MORALES drove his girlfriend home to the 5200 block of South

Monitor where she lives with her family.

13. The 5200 block of South Monitor is in the Chicago Police Department's 8th District; an area called Garfield Ridge where many Chicago police officers live.

14. Defendant Officer Joseph CABRERA lives on the 5200 block of South Monitor.

15. Other Chicago police officers also live on the 5200 block of South Monitor and on the next block.

16. MORALES parked near his girlfriend's home and the couple were sitting in the car near 52nd and Monitor, calmly talking and not doing anything illegal when CABRERA pulled up behind them in his personal vehicle.

17. CABRERA activated his high beam headlights, shining them into MORALES's car.

18. CABRERA revved his engine loudly while directly behind MORALES's car.

19. CABRERA had consumed alcohol on October 13, 2020 and he was intoxicated.

20. CABRERA was armed with his Chicago police service weapon that night and it was loaded.

21. CABRERA got out of his car and approached the passenger side of MORALES's car, where MORALES's girlfriend was seated.

22. CABRERA began yelling loudly, inexplicably asking if MORALES and his girlfriend needed some sort of assistance and questioning their presence there.

23. MORALES and his girlfriend told CABRERA that they did not need any assistance.

24. CABRERA did not believe MORALES and his girlfriend had a right to be parked on the public street that night near where CABRERA lives.

25. CABRERA returned to his vehicle where he stayed with his high beams pointed at MORALES's vehicle, revving his engine.

26. MORALES and his girlfriend decided to drive away from CABRERA.

27. MORALES drove around the block and when they returned they did not see CABRERA

3

anymore.

28. MORALES parked his car again at a different location just down the street from his girlfriend's home.

29. CABRERA then came speeding up behind MORALES again.

30. CABRERA got out of his car again and aggressively approached MORALES's car, on the driver's side this time.

31. CABRERA was screaming at MORALES to "get the fuck out of here" or words to that effect.

32. MORALES got out of the car.

33. CABRERA then grabbed MORALES by the neck attempting to place him in a headlock or chokehold.

34. In self-defense, MORALES punched CABRERA once.

35. CABRERA then drew his Chicago police service weapon from his waistband area and began raising it towards MORALES's chest area.

36. As MORALES's girlfriend looked on and screamed in terror, CABRERA fired his service weapon at MORALES from approximately five feet away.

37. CABRERA's shot missed MORALES.

38. Terrified, MORALES ran away towards his girlfriend's home.

39. MORALES's girlfriend pleaded with CABRERA not to shoot her then ran in the same direction as MORALES towards her home.

40. CABRERA's fired shot was recognized by the Chicago Police Department's Shot Spotter technology and police were immediately dispatched to the scene.

41. After both MORALES and his girlfriend ran away, CABRERA called 911 and reported that he was an off-duty Chicago police officer and that he had discharged his weapon at 52nd and Monitor.

4

42. CABRERA falsely reported that he had been "attacked" and knocked to the ground.

43. While MORALES and his girlfriend were telling her family what happened, they heard police sirens and MORALES went outside to seek help from the police.

## MORALES Is Treated Like the Offender

44. MORALES saw police vehicles near his parked car and walked towards them.

45. MORALES saw CABRERA down the block and told police that CABRERA had shot at him and that his girlfriend had seen the whole thing.

46. MORALES was obviously and visibly shaken and in shock, to the point of hyperventilating and crying.

47. Defendant OFFICERS immediately began treating MORALES as if he were a suspect.

48. Defendant OFFICERS handcuffed MORALES and/or allowed him to remain handcuffed.

49. Defendant OFFICERS searched MORALES, including under his clothing.

50. Defendant OFFICERS detained MORALES in the back of a locked police car.

51. Defendant OFFICERS did not make any observations that would lead a reasonable officer to suspect MORALES was intoxicated or under the influence of any drugs or alcohol.

52. If it was not obvious to them at first, Defendant OFFICERS and Defendant Detectives continued to treat MORALES as the offender long after they knew or should have known that he was the victim, because CABRERA was a police officer.

53. Several responding officers were wearing body worn cameras ("BWCs") which initially recorded their activities on scene, but they deactivated their cameras after an UNIDENTIFIED SUPERVISORY OFFICER on the scene told them to turn them off.

54. Defendant OFFICERS and DETECTIVES continued to conduct their investigation and to interact with both MORALES and CABRERA after the BWCs were turned off.

5

## CABRERA is Treated Like a Victim and Protected by His Fellow Officers

55. CABRERA was not handcuffed at the scene that night.

56. CABRERA was not searched or even patted down at the scene that night.

57. CABRERA was not detained in the back of a police car.

58. CABRERA was allowed to consult with at least one other off duty Chicago police officer who also lived on the block and who was outside talking with the on-duty officers and CABRERA.

59. On information and belief, CABRERA was allowed to keep his phone.

60. Defendant OFFICERS and DETECTIVES knew or should have known that CABRERA was drunk when he shot at MORALES.

61. When any of the Defendant OFFICERS or DETECTIVES encountered CABRERA that night, he smelled of alcohol.

62. When any of the Defendants OFFICERS or DETECTIVES encountered CABRERA that night, CABRERA was behaving like he was intoxicated.

63. When any of the Defendant OFFICERS or DETECTIVES encountered CABRERA on the scene that night, a reasonable officer would have concluded that CABRERA was intoxicated or under the influence of drugs or alcohol.

64. Defendant RAMAGLIA and JANIA are Defendant CABRERA's near neighbors. JANIA is CABRERA's next door neighbor and RAMAGLIA is JANIA's next door neighbor.

65. Both RAMAGLIA and JANIA were outside with CABRERA shortly after he shot at MORALES, interacting with CABRERA and Defendant OFFICERS and DETECTIVES.

66. At first, CABRERA indicated he did not want or need an ambulance.

67. On information and belief, Defendant RAMAGLIA suggested to CABRERA that he ask for an ambulance so that he would have time to sober up and to consult with other police officers and a Fraternal Order of Police (FOP) representative before he made any statements to investigators.

68. On information and belief, Defendant RAMAGLIA suggested CABERA claim that he was suffering chest pains so that he would be taken to the hospital, and could avoid having to give statements about what happened until later.

69. An ambulance was summoned for CABRERA.

70. No ambulance was summoned for MORALES despite the fact that the responding officers recognized he was in extreme distress, hyperventilating and likely in shock.

71. Defendant OFFICERS and/or DETECTIVES allowed there to be a four-hour delay before CABRERA was subjected to a breathalyzer examination.

72. When CABRERA was finally subjected to a breathalyzer examination approximately four hours later, his BAC was .104.

73. Defendant JANIA's home is across the street from where CABRERA shot at MORALES.

74. On the date of the shooting, Defendant JANIA had two Ring security cameras affixed to the front of his house and pointing in the general direction of where the shooting occurred.

75. Defendant JANIA also had a Ring security camera over his garage.

76. On information and belief, the cameras on the front of JANIA's home were operational at the time of the shooting.

77. The Ring security camera affixed to Defendant JANIA's garage recorded the initial interaction between Defendant CABRERA and MORALES before MORALES drove away to get away from CABRERA the first time.

78. On information and belief, one or both of the Ring security cameras affixed to the front of Defendant JANIA's home also captured his neighbor, Defendant CABRERA, shooting at MORALES.

79. During the investigation, Defendant JANIA only provided investigating officers one video recording from the Ring security camera on his garage.

7

80. On information and belief, Defendant JANIA withheld and/or destroyed and/or allowed to be destroyed video recording(s) from the Ring security camera(s) on the front of his house in an effort to conceal Defendant CABRERA's misconduct.

81. One or more of the other individual Defendants were aware that JANIA's ring cameras did or should have captured the shooting event, but intentionally failed to take reasonable steps to obtain and preserve this video evidence.

**MORALES is Detained and Interrogated for Several Hours**

82. While CABRERA was being taken to a hospital, MORALES was transported to the police station at 51st and Wentworth.

83. MORALES was locked in a holding cell.

84. MORALES was made to remove his shoelaces and surrender all his belongings to the police.

85. Despite his repeated requests to call his Mom, Defendant OFFICERS and/or DETECTIVES would not allow MORALES to call anyone.

86. Defendant OFFICERS and/or DETECTIVES detained MORALES at 51st and Wentworth overnight.

87. Defendant OFFICERS and/or DETECTIVES interrogated MORALES, pressuring him to change his story to say things that might help their fellow officer, Defendant CABRERA.

88. While MORALES was being detained and interrogated, his mother went to the police station twice, once that night and again in the morning. Both times, MORALES's mother was denied access to her son and was told that he was "being held for questioning" and they did not know when or if he would be released.

89. Throughout the police "investigation" that night and the next day, Defendant OFFICERS and DETECTIVES treated both MORALES and CABRERA differently than they would have if CABRERA was not a Chicago police officer.

8

90. Eventually, MORALES was released without any criminal charges.

91. Three months later, on January 6, 2021, the Cook County State's Attorneys' Office charged CABRERA with Aggravated Discharge of a Weapon for unlawfully shooting at MORALES.

92. Later, the Cook County State's Attorney also indicted CABRERA for attempt murder.

93. The criminal charges against MORALES are pending in the Cook County criminal division as of the date of this filing.

## The City of Chicago's Biased and Broken Police Accountability System

94. The Chicago City Council has long been aware of the disciplinary failures plaguing the Chicago Police Department. At an October 2007 meeting of the Council's Committee on the Budget and Government Operations, a Council member remarked of the Office of Professional Standards ("OPS") that "there is no follow-up [of citizen complaints], and I think we have to move beyond the code of silence and the protection of the police officers and command staff at any cost."

95. One study demonstrated that from 2001-2006, only 0.2% of complaints against Chicago police officers were meaningfully sustained (resulting in a suspension of a week or more), with 662 officers having 11 or more complaints against them. The same study indicated that a brutality complaint was 94% less likely to be sustained in Chicago than in the rest of the nation.

96. In 2007, and in response to growing concern about the lack of police accountability in Chicago, the City Council enacted an ordinance in 2007 to replace OPS with a civilian-run agency called the Independent Police Review Authority ("IPRA").

97. However, the five-year collective bargaining agreements entered into by the City of Chicago with the Fraternal Order of Police pre- and post-IPRA contained identical provisions preserving and protecting police officers in disciplinary investigations and preventing much needed police accountability for officer misconduct such as a "Bill of Rights" affording an accused officer certain rights that act as a barrier to police accountability, such as restrictions on the

9

investigation of anonymous complaints; and limitations on the use of previous un-sustained complaints against an officer in subsequent disciplinary actions.

98. OPS investigators simply became IPRA investigators.

99. For years, IPRA used the OPS manual as its operational manual.

100. For all intents and purposes, IPRA was a continuation of OPS.

101. Like OPS, IPRA was largely an agency that served to protect police officers. It failed to fairly and impartially investigate citizen complaints and it failed to promote its stated purposes of transparency and police accountability.

102. In 2016, in the wake of the Laquan McDonald scandal which ultimately resulted in the removal of the Mayor, the State's Attorney, the Superintendent of Police and the head of IPRA, the City of Chicago again rebranded the agency tasked with investigating improper use of force allegations by its police officers. It is now called the Civilian Office of Police Accountability ("COPA").

**The Chicago Police Department's Code of Silence**

103. The Chicago Police Department has a long history of covering up its officers' misconduct, including off-duty misconduct, and Defendant CITY has been aware of this widespread custom and practice for many years.

104. This "Code or Silence" and/or "Blue Shield," exists within the CPD, wherein officers cover up the misconduct of their fellow officers, allowing officers to act with impunity and to believe their acts of misconduct will not be properly investigated and will go unpunished.

105. For example, on November 13, 2012, in the case of *Obrycka v. City of Chicago, et al.*, 07 CV 2372, a federal jury returned a verdict against Defendant CITY and former Chicago police officer Anthony Abbate, finding that Defendant CITY had a widespread, persistent custom or practice of covering up police misconduct, i.e., the Code of Silence.

10

106. The *Obrycka* case arose out of Abbate's severe beating of a female bartender while Abbate was off-duty and intoxicated.

107. Abbate and other Chicago police officers attempted to suppress and destroy surveillance camera video recordings of the attack and made threats against Obrycka and other employees of the bar where she worked in an effort to cover up Abbate's misconduct.

108. The *Obrycka* jury found that Defendant CITY's persistent widespread custom or practice was the moving force behind Abbate's conduct when he physically beat the plaintiff on February 19, 2007, and awarded the plaintiff in that case $850,000 in compensatory damages.

109. In August 2015, a Chicago police officer testified in the case of *Spalding v. City of Chicago, et al.,* 12 CV 8777, that instructors at the CPD police academy repeatedly tell officers, "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

110. On December 9, 2015, former Chicago Mayor Rahm Emanuel delivered a speech to the City Council in which he admitted that a code of silence exists and has long existed within the Chicago Police Department.

111. Former Mayor Emanuel stated that he was "looking for a new leader of the Chicago Police Department to address the problems at the very heart of the policing profession. This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues."

112. Former Mayor Emanuel also stated, "[w]e cannot ask citizens in crime-ravaged neighborhoods

11

to break the code of silence if we continue to allow a code of silence to exist within our own police department."

113. Emanuel also stated that "[p]ermitting and protecting even the smallest acts of abuse by a tiny fraction of our officers leads to a culture where extreme acts of abuse are more likely, just like what happened to Laquan McDonald."

114. Emanuel also admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place failed," and that "Our city has been down this road before."

115. Emanuel created a task force to investigate both CPD and IPRA, headed by current Mayor Lori Lightfoot, and it was called the "Police Accountability Task Force" ("PATF").

116. In April 2016, the PATF also concluded that a code of silence exists within the Chicago Police Department. *See PATF Report*, pgs. 12, 70.

117. Specifically, the Mayor's Task Force concluded, among other things, that the code of silence is "institutionalized and reinforced by CPD rules and polices that are also baked into the labor agreements between the various police unions and the City." *Id.* at pg. 70.

118. The Mayor's Task Force also found that IPRA "investigations are riddled with structural, cultural and procedural problems that cast doubt on the intentions and integrity of the investigating agencies and the larger oversight system. Misconduct goes uninvestigated despite the availability of information about these incidents; investigations are hampered by unreasonable and unjustified procedures; and the investigative agencies lack the resources and support to be effective, and show troubling signs of bias." *Id.* at 77.

119. The United States Department of Justice ("DOJ") also undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

120. The DOJ report concluded that IPRA did not adequately investigate allegations of police

misconduct. For example, the DOJ report found that IPRA sustained fewer than 2% of the 30,000 police misconduct complaints Defendant CITY received from 2011 to 2016. *See DOJ Investigation of Chicago Police Department Report*, at pg. 7

121. The DOJ report also found that IPRA investigations were biased in favor of police officers accused of misconduct. *Id.* at pg. 67.

122. The DOJ report concluded that "IPRA's deficiencies…played a central role in allowing patterns of unconstitutional force to persist." *Id.* at pg. 6.

123. The DOJ report also outlined the Chicago Police Department's significant history of violent misconduct by off-duty police officers, as well as efforts by the Chicago Police Department to cover up off-duty misconduct. *Id.* at pgs. 28-29, 79.

124. The DOJ report became the basis of a legal action instituted against Defendant CITY by the Illinois Attorney General's Office, which led to a consent decree intended to reform the Chicago Police Department.

125. In January 2019, Defendant CITY entered into a court-approved consent decree intended to reform the Chicago Police Department.

126. An Independent Monitoring Team ("IMT"), overseen by Judge Robert M. Dow, Jr., assesses the City and CPD's compliance with the Consent Decree in biannual reports. (Each report assesses a portion of the paragraphs of the Consent Decree and will assess all paragraphs at the end of three years.) The IMT has so far issued three reports with a clear trend across both: the City and CPD have failed to comply with the reform schedule. In the first report, the City and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree. The City and CPD missed 37 of 50 deadlines. The City's record in the second report was no better. In that report, filed on June 18, 2020, the City and CPD missed 52 of 74 deadlines. Finally, in the third report, filed on April 8, 2021, the City and CPD missed

13

24 of 43 deadlines.

127. Moreover, this past summer, Chad Williams, the former civilian commanding officer of CPD's audit division sent Mayor Lori Lightfoot a resignation letter claiming that CPD's top leadership failed "to even feign interest in pursuing reform in a meaningful manner."

128. CPD continues to fail at reforming its unconstitutional practices and the City of Chicago continues to be deliberately indifferent to its failures.

129. CPD's Code of Silence operates in situations like what happened in this case to shield and protect the off-duty officer, or to lessen the consequences to him by shaping the narrative in his favor. The on-duty and responding police officers, like the officers in this case, participate in the code of silence by explicitly or implicitly agreeing to adopt a false narrative, or to conceal facts and evidence harmful to their fellow officer, in order to help him.

130. The systemic failures by the City of Chicago to impartially investigate allegations of excessive force by its police officers; its long history of failing to discipline its officers for improper uses of force; its failures to investigate or discipline officers for participating in the Code of Silence to protect and conceal the misconduct of fellow officers, have all contributed to the continued uses of excessive force and the continued existence of the Code of Silence in the Chicago Police Department and in the City's investigative agencies. These failures by the City have encouraged officers like Defendant OFFICERS in their belief that they can engage in misconduct, or they can help to conceal it, without suffering any consequences.

**COUNT I**
(42 U.S.C. § 1983, Excessive Force)

131. Each of the preceding paragraphs is incorporated as if fully restated here.

132. As described above, the intentional conduct of Defendant Officer CARBERA towards MORALES was objectively unreasonable under the circumstances and constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

14

133. As a direct and proximate result of this excessive force, MORALES suffered damages, which will be proven at trial.

   **WHEREFORE,** MORALES prays for a judgment against Defendant CABRERA in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT II
(42 U.S.C. § 1983, Unreasonable Search and Seizure)

134. Each of the preceding paragraphs is incorporated as if fully restated here.

135. As described above, Defendant OFFICERS, SUPERVISOR and DETECTIVES searched, detained and/or arrested MORALES, or caused him to be searched, detained and/or arrested, without probable cause or legal justification, in violation of the Fourth Amendment to the United States Constitution.

136. As a direct and proximate result of this illegal arrest, MORALES suffered a loss of liberty and other damages, which will be proven at trial.

   **WHEREFORE,** MORALES prays for a judgment against the individual Defendants in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT III
(Policy Claim – Defendant CITY)

137. Each of the preceding paragraphs is incorporated as if fully restated here.

138. The misconduct of Defendant OFFICERS alleged above was undertaken pursuant to the policy and practice of Defendant CITY of Chicago.

139. As a matter of both policy and practice, Defendant CITY encourages the type of police misconduct at issue in this case by failing to supervise, train, investigate, and/or discipline Chicago police officers, and these failures constitute deliberate indifference.

140. The following of Defendant CITY's policies and persistent widespread customs and practices were the driving force behind Defendant OFFICERS' misconduct and caused harm to MORALES:

    a. The CITY has failed to adequately and impartially investigate Chicago police misconduct for decades.

    b. The CITY has failed to properly or meaningfully discipline its police officers for uses of excessive force.

    c. The CITY encourages its police department and investigative agencies to protect its police officers from accountability by allowing and fostering a "code of silence" in the Chicago police department.

    d. The City has failed to adequately train its police officers about the Code of Silence.

    e. The CITY has participated in the Code of Silence by allowing CPD to retaliate against officers who break the Code of Silence and come forward to report the misconduct of fellow officers.

    f. The City of Chicago has failed to discipline officers for participating in the Code of Silence.

141. These policies, practices, or customs of Defendant CITY individually and collectively, have been maintained and/or implemented with deliberate indifference by Defendant CITY, encouraging and allowing Defendant OFFICERS to commit the wrongful acts they did in this case.

142. These policies, practices, or customs of Defendant CITY, individually and/or collectively, were the moving force behind Defendant OFFICERS' conduct, depriving of MORALES of his rights under the United States Constitution.

   **WHEREFORE**, MORALES prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate him for his damages, as well as injunctive and declaratory relief and such other relief as is just and equitable.

16

## COUNT IV
(42 U.S.C. § 1983, Conspiracy)

143. Each of the preceding paragraphs is incorporated as if fully restated here.

144. As more fully alleged above, the individual Defendants reached an implied or explicit agreement among themselves to unlawfully detain and interrogate MORALES.

145. In furtherance of their conspiracy, the individual Defendants committed overt acts meant to protect their fellow officer, CABRERA, including but not limited to treating both MORALES and CABRERA differently than they would have if CABRERA was not a Chicago police officer, detaining MORALES while protecting and shielding CABRERA, turning off their body worn cameras despite the fact that they were still collecting evidence, suggesting that CABRERA request an ambulance in order to delay his statement to investigators, altering video evidence, and highlighting or suggesting MORALES and his girlfriend include certain things in their video statements that would aid CABRERA in any future disciplinary action, criminal case or civil lawsuit, such as this one.

146. As a direct and proximate result of Defendants OFFICERS' misconduct, MORALES suffered damages, including emotional damages and a loss of liberty, which will be proven at trial.

   **WHEREFORE**, MORALES prays for a judgment against the individual Defendants in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT V
(42 U.S.C. § 1983, Supervisory Liability)

147. Each of the preceding paragraphs is incorporated as if fully restated here.

148. At all relevant times, Defendant GORMAN was a supervisory-level police official on the Chicago Police Department.

149. It was the responsibility of Defendant GORMAN to supervise the conduct of the Defendant OFFICERS who took part in unlawfully arresting and detaining Plaintiff.

150. Rather than properly supervising the Defendant OFFICERS, Defendant GORMAN condoned or turned a blind eye to their unlawful behavior, allowed them to treat MORALES like an offender and to allowed them to continue to unlawfully detain MORALES, and document a false narrative in their police reports.

151. As a direct and proximate result of Defendant SUPERVISOR'S failure to supervise Defendant OFFICERS, Plaintiff suffered damages, which will be proven at trial.

**WHEREFORE**, Plaintiff prays for a judgment against Defendant GORMAN in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorney's fees, and such other relief as is just and equitable.

## COUNT VI
(Illinois False Imprisonment Claim)

152. Each of the preceding paragraphs is incorporated as if fully restated here.

153. As more fully alleged above, Defendant OFFICERS, SUPERVISOR and DETECTIVES unlawfully detained MORALES, or caused him to be unlawfully detained, without legal justification to do so.

154. Defendants acted willfully and wantonly in that they intended to violate, or were recklessly indifferent towards violating, MORALES's rights.

155. As a direct and proximate result of Defendants' misconduct, MORALES suffered damages, including emotional damages and a loss of liberty, which will be proven at trial.

**WHEREFORE**, MORALES prays for a judgment against Defendants in a fair and just amount sufficient to compensate MORALES for his damages and such other relief as is just and equitable.

## COUNT VII
(Illinois Assault and Battery)

156. Each of the preceding paragraphs is incorporated as if fully restated here.

157. As more fully described above, Defendant CABRERA knowingly and intentionally and without legal justification grabbed MORALES by the neck committing a battery against him.

158. In addition, Defendant CABRERA, knowingly and intentionally and without legal justification placed MORALES in reasonable fear of receiving a battery when he pointed his service weapon at Morales and fired a shot at him.

159. As a direct and proximate cause of CABRERA's assault and battery of MORALES, MORALES suffered damages which will be proven at trial.

**WHEREFORE**, MORALES prays for a judgment against CABRERA and Defendant CITY in a fair and just amount sufficient to compensate MORALES for his damages and such other relief as is just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

ESAEL MORALES, Plaintiff

By: /s Torreya L. Hamilton
   Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC
53 West Jackson Boulevard, Suite 620
Chicago, Illinois 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Attorney No. 6229397